IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITADEL SECURITIES LLC, GROUP ONE TRADING LP, RONIN CAPITAL, LLC, SUSQUEHANNA SECURITIES AND SUSQUEHANNA INVESTMENT GROUP, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED, INTERNATIONAL SECURITIES EXCHANGE, LLC, NASDAQ OMX PHLX (f/k/a PHILADELPHIA STOCK EXCHANGE, INC.), NYSE ARCA, INC. (f/k/a PACIFIC EXCHANGE, INC.), NYSE MKT LLC (f/k/a NYSE AMEX LLC, f/k/a AMERICAN STOCK EXCHANGE LLC), | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# <u>EXHIBIT A</u>

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| Citadel Securities LLC, Group One Trading LP, Ronin Capital, LLC, Susquehanna Securities and Susquehanna Investment Group, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| | ) Case No. 13CH13246 |
| Chicago Board Options Exchange, Inc., International Securities Exchange, LLC, NASDAQ OMX PHLX (f/k/a Philadelphia Stock Exchange, Inc.), NYSE Arca, Inc. (f/k/a Pacific Exchange, Inc.), NYSE MKT LLC (f/k/a NYSE Amex LLC, f/k/a American Stock Exchange LLC), | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**FILED**
CH-2804
MAY 22 2013
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiffs Citadel Securities LLC ("Citadel"), Group One Trading LP ("Group One"), Ronin Capital, LLC ("Ronin"), Susquehanna Investment Group ("Susquehanna Investment Group") and Susquehanna Securities ("Susquehanna Securities") (collectively, the "Market Makers") complain against Defendants Chicago Board Options Exchange, Inc. ("CBOE"), International Securities Exchange, LLC ("ISE"), NASDAQ OMX PHLX (f/k/a Philadelphia Stock Exchange, Inc.) ("PHLX"), NYSE Arca, Inc. (f/k/a Pacific Exchange, Inc.) ("NYSE Arca"), NYSE MKT LLC (f/k/a NYSE Amex LLC, f/k/a American Stock Exchange LLC) ("AMEX") (collectively, the "Exchanges") as follows:

### Nature of the Action

1.      This case presents a remarkable situation. In this case, there is no dispute that the Exchanges improperly charged fees to the Market Makers on millions of orders over an

approximately seven-year period. Rather, the dispute arises from the Exchanges' assertion that they are entitled to mischarge their members without taking any responsibility for it and without any liability under the law. This Court, therefore, is faced with the spectacle of Exchanges admittedly charging their members improper fees for approximately seven years and claiming the unfettered right to do so without any consequences or responsibility of any kind.

2.      The Market Makers operate as both market makers and specialists on numerous options exchanges, including the defendant Exchanges. Market makers are members of the Exchanges that are obligated to buy and sell particular options on a regular and continuous basis at a publicly quoted price. Specialists are market makers that are assigned certain options classes by the Exchanges and are obligated to buy or sell as many options contracts as needed to ensure a fair and orderly market in their assigned options classes.[1]

3.      Between at least January 2004 and June 2011 (the "relevant time period"), the Exchanges operated what they described as "payment for order flow" or "marketing fee" programs ("PFOF Programs"). The PFOF Programs served no official, regulatory or governmental purpose. Rather, the private business purpose of each PFOF Program was (a) to increase order flow to the Exchange, (b) to enhance the Exchange's competitive position as a for-profit business, (c) to increase the Exchange's market share, and thereby (d) to generate more revenue and, ultimately, more profits for the Exchange.

4.      Pursuant to the PFOF Programs, the Exchanges assessed fees ranging from $0.10 to $1.00 per contract on certain orders executed by specialists and market makers ("PFOF

---

[1] Specialists are classified differently at each of the Exchanges. For purposes of this Complaint the term "specialists" will be used to encompass specialists, designated primary market makers (DPMs), primary market makers (PMMs) and/or lead market makers (LMMs).

Fees"). The Exchanges collected the PFOF Fees from the specialists and market makers and used those funds to compensate order flow providers.

5.   Orders for which a charge was assessed under the PFOF Programs consisted primarily of public customer orders. At no time were orders submitted by market makers as part of their market making business ("market-maker to market-maker orders") subject to PFOF Fees. In addition, most orders submitted on behalf of a member's broker-dealer clients ("broker-dealer orders") or on a member's own behalf ("proprietary orders") were not subject to PFOF Fees.

6.   By the Fall of 2012, the Exchanges were aware that, during the relevant time period, the Exchanges had improperly charged the Market Makers PFOF Fees on orders that were not subject to PFOF Fees. Specifically, for approximately seven years, one of the Exchanges' prominent member firms (the "Subject Firm") had incorrectly marked orders submitted to the Exchanges as originating from public customers when in fact those orders were market-maker to market-maker orders, broker-dealer orders or proprietary orders ("mismarked orders"). The Subject Firm has paid the Exchanges $6,388,253 in penalties as well an unidentified amount of "transactions fees" in connection with its mismarking of orders.

7.   Belatedly, the Exchanges now recognize that they were improperly charging PFOF Fees on the Market Makers on the mismarked orders; however, the Exchanges have not reimbursed any of the improperly charged PFOF Fees to the Market Makers. In fact, after being approached by the Market Makers, the Exchanges conferred and, acting in concert, refused to reimburse any of the improperly assessed fees to the Market Makers. The Exchanges did not claim that any of the Market Makers did anything wrong or assert that the PFOF fees were compliant with the Exchanges' rules or fee schedules. Rather, the Exchanges simply asserted that they have no responsibility, and cannot be held liable, for improperly overcharging fees,

even if it is in violation of their own rules and their own publicly-noticed fee schedules. The Exchanges even refused to identify the number of orders affected or the amount of fees wrongly charged.

8.    The Market Makers seeks a declaratory judgment holding that the Exchanges are liable (a) if they improperly overcharge or wrongly assess fees of this type in violation of their own rules or fee schedules, and (b) for the wrongly assessed PFOF Fees which were improperly charged to the Market Makers during the relevant time period. The Market Makers also seeks an accounting to determine what amount is owed to them as a result of the inappropriate assessment of PFOF Fees. Finally, the Market Makers seek recovery or restitution of all PFOF Fees that were inappropriately charged by the Exchanges.

## PARTIES

### Plaintiffs

9.    Plaintiff Citadel is a Delaware limited liability company with its principal place of business located at 131 South Dearborn Street, Chicago, IL 60603. Citadel is and has been a member of CBOE since April 17, 2003, ISE since May 3, 2002, AMEX since March 12, 2004, NYSE Arca since March 23, 2004 and PHLX since December 23, 2003. As a member, market maker and specialist on the Exchanges, Citadel has paid the Exchanges millions of dollars in membership and other fees per year.

10.    Plaintiff Group One is a California limited partnership with its principal place of business located at 440 South LaSalle, Suite 3232, Chicago, IL 60605. Group One is and has been a member of CBOE since November 23, 1994, ISE since May 1, 2000, AMEX since November 17, 1994, NYSE Arca since November 23, 1994 and PHLX since March 9, 1993. As a member, market maker and specialist on the Exchanges, Group One has paid the Exchanges millions of dollars in membership and other fees per year.

11.     Plaintiff Ronin is a Delaware limited liability company with its principal place of business located at 350 North Orleans Street, Suite 2N, Chicago, IL 60654. Ronin is and has been a member of CBOE since 12/17/01 and NYSE Arca since 2/26/04. Ronin became a member of the ISE on 6/9/04 and terminated its membership on 3/15/13. Ronin became a member of AMEX on 11/5/10 and terminated its membership on 08/31/12. Ronin became a member of PHLX on 12/9/09 and terminated its membership on 9/4/12. As a member, market maker and specialist on the Exchanges, Ronin has paid the Exchanges millions of dollars in membership and other fees per year.

12.     Plaintiff Susquehanna Investment Group is a Pennsylvania general partnership with its principal place of business located at 401 E. City Avenue, Suite 220, Bala Cynwyd, PA 19004-1188. SIG also maintains an office at 175 W. Jackson Boulevard, Suite 1700, Chicago, IL 60604. SIG is and has been a member of CBOE since March 24, 1987, ISE since September 27, 2005, NYSE Arca since June 20, 2007, and PHLX since August 15, 1983. As a member and market maker on the Exchanges, SIG has paid the Exchanges millions of dollars in membership and other fees per year.

13.     Susquehanna Securities is a Delaware general partnership with its principal place of business located at 401 E. City Avenue, Suite 220, Bala Cynwyd, PA 19004-1188. Susquehanna Securities also maintains an office at 175 W. Jackson Boulevard, Suite 1700, Chicago, IL 60604. Susquehanna Securities is and has been a member of CBOE since April 4, 1994, AMEX since March 31, 1994, NYSE Arca since January 12, 2009, and PHLX since October 15, 1985. As a member and specialist on the Exchanges, Susquehanna Securities has paid the Exchanges millions [confirm] of dollars in membership and other fees per year.

5

## Defendants

14.     Defendant CBOE, a for-profit Delaware corporation, operates the largest options exchange in the United States.  CBOE is owned by CBOE Holdings, Inc., a public company.  CBOE's principal place of business is located at 400 S LaSalle Street, Floor 1, Chicago, IL 60605.

15.     Defendant ISE, a for-profit New Jersey limited liability company, operates the first all-electronic options exchange in the United States.  ISE's principal place of business is located at 60 Broad Street, Floor 26, New York, NY 10004.  ISE transacts business within the State of Illinois, including by assessing membership and other fees on member firms located in the State of Illinois and disciplining member firms located in the State of Illinois.

16.     Defendant NYSE Arca, a for-profit Delaware corporation, operates an electronic options exchange.  NYSE Arca is owned by NYSE Euronext, a public company.  NYSE Arca's principal place of business is located at 100 S. Wacker Drive, Suite 1800, Chicago, IL 60606.

17.     Defendant AMEX, a for-profit Delaware limited liability company, operates an options exchange.  AMEX is owned by NYSE Euronext, a public company.  AMEX's principal place of business is located at 11 Wall Street, New York, NY 10005.  AMEX transacts business within the State of Illinois, including but not limited to assessing listing fees on public companies located in the State of Illinois, assessing membership and other fees on member firms located in the State of Illinois, performing examinations of member firms located in the State of Illinois, and disciplining member firms located in the State of Illinois.

18.     Defendant PHLX, a for-profit Delaware Limited Liability Company, operates an options exchange.  PHLX is owned by The NASDAQ OMX Group, Inc., a public company.  PHLX's principal place of business is located at 1900 Market Street, Philadelphia, PA 19103.  PHLX transacts business within the State of Illinois, including but not limited to assessing

6

membership and other fees on member firms located in the State of Illinois, performing examinations of member firms located in the State of Illinois, and disciplining member firms located in the State of Illinois.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over this dispute pursuant to 735 ILCS 5/2-209 because each of the Exchanges transacts business within the State of Illinois, including but not limited to operating exchanges in the State of Illinois, assessing listing fees on public companies located in the State of Illinois, assessing membership and other fees on member firms located in the State of Illinois, performing examinations of member firms located in the State of Illinois, and disciplining member firms located in the State of Illinois.  In addition, each Exchange has made and performed contracts and/or promises substantially connected to the State of Illinois.

20.    Venue in this Court is appropriate pursuant to 735 ILCS 5/2-101 because both CBOE and NYSE Arca reside in Cook County, Illinois and because this action arises out of conduct that took place at least in part in Cook County, Illinois.

## FACTS APPLICABLE TO ALL COUNTS

### The Exchanges' Payment for Order Flow Programs

21.    During the relevant time period, each of the Exchanges operated a PFOF Program whereby the Exchanges compensated order flow providers through PFOF Fees charged to market makers and specialists on certain orders that they executed.

22.    The PFOF Programs were not part of the Exchanges' official business and served no regulatory, governmental or quasi-governmental function.  The Exchanges, acting in their private business capacity as for-profit businesses, initiated and administered the PFOF Programs for the Exchanges' own corporate benefit.  The purpose of a PFOF Program is to give the Exchange, as a for-profit business, a competitive advantage by providing a monetary incentive

7

for order flow providers to submit their orders to that Exchange thereby enhancing the Exchange's competitive position, maintaining and expanding the Exchange's market share and increasing revenues and, ultimately, profits to the Exchange. By instituting and administering the PFOF Programs, the Exchanges improved their business prospects, their competitive business posture and their revenue and profitability.

23.     In establishing, or re-establishing,[2] a PFOF Program, each Exchange drafted and submitted proposed changes to its rules and/or fee schedules (referred to as "proposed rule changes") to the U.S. Securities and Exchange Commission ("SEC") which were made available for public comment and which required SEC approval. In these proposed rule changes, each Exchange acknowledged that the purpose of its program was to attract order flow to the Exchange and thus enhance the Exchange's competitive position. Indeed, several Exchanges even acknowledged that these programs could cause direct conflicts with the Exchanges' official regulatory functions:

a.     AMEX's notice of its proposed rule change reinstituting a PFOF Program states that "[t]he Amex believes that [other exchanges' payment for order flow] programs operate to the competitive disadvantage of the Amex" and that even though, such programs "create the appearance of serious conflicts of interest between the business objectives of the self-regulatory organization and its statutory duties, …the Amex believes it may be necessary to reinstitute its payment for order flow program in order to respond to these competitive pressures." The notice further states that "[a]fter thorough consideration, the

---

[2] All of the Exchanges had PFOF Programs in place as of early 2001, but the CBOE, AMEX and PHLX suspended their programs in mid-2001. NYSE Arca and ISE continued to operate their PFOF Programs and, in late 2002 and 2003, CBOE, AMEX and PHLX reinstated their PFOF Programs.

Exchange has determined to reinstate its marketing fee program in a modified form effective June 2, 2003. The revenue generated by these marketing fees would be used to compete for order flow in equity options listed for trading on the Exchange." Proposed Rule Change by the AMEX Relating to a Marketing Fee To Be Imposed on Certain Transactions of Specialists and Registered Options Traders, Exchange Act Release No. 34-48053, 68 Fed. Reg. 37,880 (June 25, 2003).

b. CBOE's notice of proposed rule change reinstating its payment for order flow program states that "[t]he CBOE believes that [the other exchanges' payment for order flow] programs operate to the competitive disadvantage of the CBOE" and the "[t]he CBOE believes this marketing fee will serve to enhance the competitiveness of the CBOE and its members...." Proposed Rule Change by the Chicago Board Options Exchange, Inc. To Reinstate the Imposition of a Marketing Fee, Exchange Act Release No. 34-47948, 68 Fed. Reg. 33,749 (June 5, 2003). In a regulatory circular issued to its members announcing the reinstatement of a PFOF Program, the CBOE stated that its Board of Directors had determined to reinstitute the program "in recognition of the competitive forces within the options industry which require such a fee so that the Exchange can remain competitive."

c. NYSE Arca's notice of proposed rule change establishing a PFOF Program states that "[t]he purpose of the proposed new fee is to provide a source of revenue to the Exchange to be used in response to changing competitive circumstances that have arisen and may continue to arise in particular multiply traded equity options

issues. These circumstances include the growing practice by some traders on options exchanges of paying brokers for orders in multiply traded issues directed to them. In light of this development and in order to be competitive in multiply traded options, the PCX has determined to impose a new fee on market makers' transactions in designated equity option issues." Proposed Rule Change by the Pacific Exchange, Inc. Relating to a New Fee on Market Makers' Transactions in Designated Equity Option Issues, Exchange Act Release No. 34-43290, 65 Fed. Reg. 57,213 (Sept. 21, 2000).

d.     ISE's notice of proposed rule change implementing a PFOF Program states that "ISE believes that it must establish a level playing field on which it can compete with the other options exchanges, all of which have developed their own payment for order flow programs." Proposed Rule Change by ISE Relating to Payment for Order Flow, Exchange Act Release No. 34-43462, 65 Fed. Reg. 64,466 (October 19, 2000).

e.     PHLX's notice of proposed rule change reinstituting a PFOF Program states that "[t]he purpose of the proposed rule change is to generate a source of revenue that specialists may use to attract order flow to the Phlx, and to maintain and enhance the Phlx's competitive position." Proposed Rule Change by the PHLX Relating to Its Payment for Order Flow Program, Exchange Act Release No. 34-47090, 68 Fed. Reg. 141 (Jan. 2, 2003).

24.     The amount of PFOF Fees that an Exchange is able to charge and the types of orders that are subject to PFOF fees are set forth in fee schedules that are noticed, published and

approved by the SEC. These fee schedules, like any Exchange rule, constitute an agreement between the Exchanges and their members.

25.     Pursuant to the fee schedules, the Exchanges assessed PFOF Fees on orders executed by specialists and market makers in amounts that varied during the relevant time period:

a.      AMEX charged between $0.35 and $1.00 per contract.

b.      CBOE charged between $0.22 and $0.65 per contract.

c.      ISE charged between $0.10 and $0.65 per contract.

d.      NYSE Arca charged between $0.45 and $1.00 per contract.

e.      PHLX charged between $0.25 and $1.00 per contract.

26.     Not all orders executed by specialists were subject to PFOF Fees. Because the primary purpose of the PFOF Programs was to drive and attract order flow from public customers to the Exchanges, customer orders generally were the only orders subject to such fees:

a.      Pursuant to AMEX's PFOF Program, only customer orders were subject to PFOF Fees.

b.      Pursuant to CBOE's PFOF Program from May 2003 until December 12, 2005 and from August 1, 2009 through the end of the relevant time period, only customer orders were subject to PFOF Fees. During the remaining portion of the relevant time period, certain orders submitted on behalf of broker-dealers and proprietary orders were subject to PFOF Fees. At no time, however, were market-maker to market-maker orders subject to PFOF Fees.

c.      Pursuant to ISE's PFOF Program, only customer orders were subject to PFOF Fees.

d.    Pursuant to NYSE Arca's PFOF Program, eligible orders included only customer orders for equity options and, for a portion of the relevant time period, non-customer orders for certain exchange traded funds. At no time, however, were market-maker to market-maker orders subject to PFOF Fees.

e.    Pursuant to PHLX's PFOF Program, only customer orders were subject to PFOF Fees.

27.    During the relevant time period, as part of their private business operations and as a feature of the PFOF Programs, the Exchanges were responsible for tracking the orders sent by the order flow providers and subject to PFOF Fees, billing the specialists, collecting and maintaining the funds[3] and issuing payments to the order flow providers.

28.    The Exchanges collected hundreds of millions of dollars in PFOF Fees during the relevant time period. For example, between 2004 and 2010, the CBOE alone collected a total of approximately $637 million in PFOF Fees as follows:

| Year | PFOF Fees collected* |
|------|----------------------|
| 2004 | $14.1 million |
| 2005 | $42.1 million |
| 2006 | $96.5 million |
| 2007 | $125.0 million |
| 2008 | $131.9 million |
| 2009 | $126.2 million |
| 2010 | $101.3 million |
| **Total** | **$637.1 million** |

* This information was obtained from CBOE Holdings, Inc.'s annual reports.

---

[3] CBOE initially required that the specialists' clearing firms debit the appropriate amount of fees from the specialists' accounts and credit the accounts of the order flow providers. In November 2004, however, CBOE created a system whereby CBOE was responsible for maintaining the funds, keeping track of the number of orders submitted by order flow providers and subject to PFOF Fees, and making the necessary debits and credits to the accounts of the specialists and the order flow providers.

29.     The Exchanges also collected transaction fees and other exchange fees on the increased order flow that was directed to the Exchanges as a result of the PFOF Programs. Unlike the PFOF Fees, these transaction fees were not paid to order flow providers, but rather constituted Exchange revenue. In this way, the PFOF Programs, by attracting order flow to the Exchanges, and thereby generating the associated transaction fees, increased Exchange revenue and profits. In fact, the primary purpose of the PFOF Programs was to increase order flow and thereby generate increased transactions fees.

30.     PFOF Programs, by increasing order flow and thereby generating transaction fees, played an integral role in increasing the Exchanges' revenues. Transaction fees are the largest source of revenue for the Exchanges. During the relevant time period, CBOE collected more than $1.7 billion in transactions fees:

| Year | Transaction Fees* |
|-------|------------------|
| 2004 | $116.3 million |
| 2005 | $143.3 million |
| 2006 | $193.4 million |
| 2007 | $276.1 million |
| 2008 | $343.8 million |
| 2009 | $314.5 million |
| 2010 | $330.3 million |
| **Total** | **$1,717.70 million** |

* This information was obtained from CBOE Holdings, Inc.'s annual reports.

### The Exchanges' Findings Relating to Mismarking of Orders

31.     At least by Fall 2012, each of the Exchanges was aware that the Subject Firm, during an approximately seven-year period, had been mismarking vast numbers of non-customer orders as customer orders.

32.     Following this discovery, the Exchanges negotiated with the Subject Firm and ultimately accepted stipulations or letters of consent from the Subject Firm that contained findings against the Subject Firm and provided for the firm to pay penalties as follows:

| Exchange | Date of Stipulation or Letter of Consent | Penalties |
|---|---|---|
| CBOE | September 20, 2012 | $3,750,000 in penalties plus an undisclosed amount of transaction fees |
| ISE | 2012[4] | $1,074,788 plus $899,440 in previously uncollected fees |
| NYSE Arca | September 20, 2012 | $671,305 in penalties plus an undisclosed amount of transaction fees |
| PHLX | October 10, 2012 | $448,459 in penalties plus an undisclosed amount of transaction fees |
| AMEX | September 20, 2012 | $443,700 in penalties plus an undisclosed amount of transaction fees |
| | TOTAL: | $6,388,252 in penalties plus an undisclosed amount of transaction fees |

33.     The Subject Firm paid a total of $6,388,252 in penalties to the Exchanges plus an undisclosed amount of transaction fees.  The Exchanges announced that these penalties had been paid to the Exchanges just several months before informing the Market Makers that the Exchanges would not reimburse the Market Makers for any of the incorrectly charged PFOF Fees.

34.     In its Decision Accepting Letter of Consent, the CBOE made an express finding that from approximately January 2004 through in or about May 2010, the Subject Firm had marked numerous options orders with an improper origin code.  Specifically, the Subject Firm had identified orders as orders originating from its customers when, in fact, those orders were not customer orders.

---

[4] ISE disclosed that it had accepted a Letter of Consent in its list of 2012 Final Disciplinary Actions as of December 31, 2012, but did not indicate the date of the Letter of Consent.

35.     According to the CBOE's findings, the mismarking of orders was the result of two deficient order entry systems used by the Subject Firm during the relevant time period.

36.     The first system was implemented in 2004 and was designed to handle simple options orders.  The CBOE found that this order entry system "did not include a market maker (M) order origin code" and "defaulted automatically to the Customer (C) origin code in the event a user did not select an origin code."

37.     The second system was implemented in 2008 and was designed to handle complex options orders.  The CBOE found that this order entry system "was programmed to code all orders with a C [customer] origin code."

38.     CBOE found that, as a result of these deficiencies in the order entry systems, the Subject Firm had "marked numerous options orders with an improper origin code ...."

39.     AMEX and NYSE Arca similarly found that, between January 2004 and June 2011, the Subject Firm "improperly marked certain options orders on behalf of broker-dealers and market makers as 'customer' through various proprietary order entry systems employed by [the Subject Firm] to send options orders to the Exchange...."

40.     ISE and PHLX also found that, between January 2004 and May 2010, the Subject Firm improperly marked "certain options orders on behalf of broker-dealers and market makers as 'customer' through various proprietary order entry systems employed by [the Subject Firm] to send options orders to the Exchange...."

### Significance of the Exchanges' Findings

41.     In their decisions accepting the stipulations and letters of consent, the Exchanges agreed and found that *all* market-maker to market-maker orders and numerous broker-dealer orders and proprietary orders submitted by the Subject Firm during the relevant time period were improperly marked as orders submitted on behalf of customer orders.

42.     Market-maker to market-maker orders were never subject to PFOF Fees under any of the Exchanges' PFOF Programs. Likewise, proprietary orders and broker-dealer orders were not subject to PFOF Fees under AMEX's, ISE's, NYSE Arca's (with the exception of certain orders for two exchange traded funds) and PHLX's PFOF Programs. Broker-dealer orders and proprietary orders were also not subject to PFOF Fees under the CBOE's program during portions of the relevant time period.

43.     Each Market Maker executed significant numbers of orders submitted by the Subject Firm including orders that were mismarked as customer orders.

44.     The Exchanges wrongfully charged the Market Makers PFOF Fees on those mismarked orders that were not subject to such fees.

45.     Despite their admissions that vast numbers of orders were mismarked as customer orders and that, as a result, the Exchanges improperly assessed PFOF Fees to the Market Makers, the Exchanges have failed and refused to provide an accounting of the improperly assessed fees or reimburse any of those fees to the Market Makers. Indeed, the Exchanges have not only refused to reimburse any of the improperly charged PFOF fees, the Exchanges have refused to even identify the mismarked orders or the amount of fees improperly charged to the Market Makers.

46.     Disavowing any responsibility, the Exchanges have asserted that they have no responsibility for, and cannot be held liable for, improper fee charges because, according to the Exchanges, the rules of each Exchange supposedly preclude liability for any improper fees charged and collected by the Exchanges. The Exchanges' reliance on these rules is baseless.

47.     Specifically, the Exchanges have relied upon CBOE Rule 6.7(a), NYSE MKT [AMEX] Rule 905NY(a) and NYSE Arca Rule 14.2 which state that the Exchanges shall not be

liable "for any loss, expense, damages or claims that arise out of the use or enjoyment of the facilities or services afforded by the Exchange ...", ISE Rule 705(a) which states that it "shall not be liable to Members ... for any loss, expense, damages or claims arising out of the use of the facilities, systems or equipment afforded by the Exchange, nor any interruption in or failure or unavailability of any such facilities, systems or equipment..." and PHLX Rule 652(a) which states that it "shall not be liable for any damages sustained by a member ... arising out of or relating to the use or enjoyment ... of the facilities afforded by the Exchange to members for the conduct of their business."

48. These rules, which constitute contracts between the Exchanges and their members, were designed to protect the Exchanges "against losses which might be incurred by members as a result of their use of" the Exchanges' "systems and procedures for execution, clearance and settlement of Exchange transactions." CBOE Proposed Rule Change, Release No. 34-14777, 78 Fed. Reg. 14552 (May 24, 1978); AMEX Proposed Rule Change, Release No. 34-61774 (March 24, 2010) (proposing new Rule 905NY "regarding the Exchange's liability for system outages"). For example, the rules preclude liability on the part of an Exchange in the event that its electronic quote system suffers a temporary outage due to a utility company's power grid failure. These rules were not designed to immunize and do not protect the Exchanges from harm to their members caused by the Exchanges' revenue-generating activity that violates their own rules and/or fee schedules. These rules do not give the Exchanges free rein to charge improper fees in violation of their own fee schedules thereby enhancing the Exchanges' competiveness and revenues while simultaneously harming their members.

49. Furthermore, the Exchanges' rules do not preclude liability for claims arising out of the Exchanges' gross negligence. The Exchanges were grossly negligent in improperly

charging millions of PFOF fees over a more than seven–year period, refusing to reimburse the Market Makers for the fees that the Exchanges improperly charged in violation of their own SEC-approved fee schedules, and continuing to withhold any information reflecting the extent of their improper charges.

50.     Moreover, the Market Makers' financial harm did not arise out of the "use of" or "enjoyment" of the Exchanges' facilities or services. Rather, their financial harm is due to and caused by the Exchanges' assessment of improper fees charged in violation of the Exchange's own fee schedules and the Exchanges' refusal to reimburse those amounts.

51.     The Exchanges' rules, including CBOE Rule 6.7(a), ISE Rule 705(a), NYSE MKT [AMEX] Rule 905NY(a), NYSE Arca Rule 14.2 and PHLX Rule 652(a), do not entitle the Exchanges to overcharge fees in violation of their publicly noticed and approved fee schedules, refuse to reimburse those fees, and then conceal the amount of fees that were overcharged.

## COUNT I (DECLARATORY JUDGMENT)

52.     The Market Makers incorporate paragraphs 1 through __ as if fully restated herein.

53.     Each of the Market Makers are members of and serve as market makers or specialists on the Exchanges. As members, market makers and specialists, they have been and continue to be subject to numerous fees of various types, including but not limited to, PFOF Fees.

54.     For a period of more than seven years, the Exchanges improperly charged the Market Makers PFOF Fees for orders that were not appropriately subject to PFOF Fees.

55.     The Exchanges, however, have asserted that, pursuant to their rules, the Exchanges are not responsible or liable for overcharging or wrongfully charging their members such as the Market Makers PFOF Fees.

18

56.     The Exchanges baselessly claim that they are not and cannot be liable for such claims because CBOE Rule 6.7(a), ISE Rule 705(a), NYSE MKT [AMEX] Rule 905NY(a) and NYSE Arca Rule 14.2 supposedly preclude any liability for any loss or claim that arises "out of the use or enjoyment of the facilities or services afforded by the Exchange." The Exchanges erroneously assert that the financial harm suffered by the Market Makers arose from their use of the Exchanges' facilities whereas, in truth, they suffered harm because the Exchanges overcharged PFOF Fees in violation of their SEC-approved fee schedules and then refused to reimburse those fees. Therefore, those Exchange rules do not apply here and do not immunize the Exchanges from liability for improperly charged PFOF Fees.

57.     The Exchanges' position that that the Exchanges' rules immunize them from liability would render the Exchanges' rules illusory and lacking in mutuality as only one party would have an obligation to comply with the rules.

58.     In addition, the Exchange rules do not apply here because the Exchanges' overcharging of PFOF Fees for an approximately seven-year period, refusing to reimburse those fees and concealing the amount of those fees constitutes gross negligence.

59.     An actual, justiciable dispute exists between the Market Makers and the Exchanges as to (a) whether the Exchanges are required to comply with their rules and fee schedules as it relates to the charging of PFOF Fees, (b) whether Exchange rules, including CBOE Rule 6.7(a), ISE Rule 705(a), NYSE MKT [AMEX] Rule 905NY(a), NYSE Arca Rule 14.2 and PHLX Rule 652(a), do not immunize and exculpate the Exchanges from liability when the Exchanges charge fees in violation of their own fee schedules, and (c) whether the Exchanges are required to reimburse the improperly charged PFOF Fees to the Market Makers.

19

60.     The Market Makers are entitled to a declaratory judgment that (a) the Exchanges are required to comply with their rules and fee schedules as it relates to the charging of PFOF Fees, (b) Exchange rules, including CBOE Rule 6.7(a), ISE Rule 705(a), NYSE MKT [AMEX] Rule 905NY(a) and NYSE Arca Rule 14.2, do not immunize and exculpate the Exchanges from liability when the Exchanges charge fees in violation of their own fee schedules, and (c) the Exchanges are required to reimburse the improperly charged PFOF Fees to the Market Makers.

WHEREFORE, the Market Makers respectfully requests that this Court enter a declaratory judgment stating that: (a) the Exchanges are required to comply with their rules and fee schedules as it relates to the charging of PFOF Fees, (b) Exchange rules, including CBOE Rule 6.7(a), ISE Rule 705(a), NYSE MKT [AMEX] Rule 905NY(a) and NYSE Arca Rule 14.2, do not immunize and exculpate the Exchanges from liability when the Exchanges charge fees in violation of their own fee schedules, and (c) the Exchanges are required to reimburse the improperly charged PFOF Fees to the Market Makers.

## COUNT II (ACCOUNTING)

61.     The Market Makers incorporate paragraphs 1 through __ as if fully restated herein.

62.     The amount of fees improperly charged by the Exchanges to the Market Makers cannot be determined without an accounting.

63.     The Market Makers do not possess or have access to information regarding which orders were mismarked, which specialists or market makers executed those orders and the amount of PFOF Fees that were improperly charged to the Market Makers. Moreover, the Market Makers have no ability to obtain that information other than from the Exchanges which

were responsible for administering the payment for order flow programs, including identifying orders subject to PFOF Fees and administering the payment of fees.

64. The Market Makers have requested that the Exchanges provide a full accounting of the PFOF Fees improperly charged by the Exchanges. Specifically, the Market Makers have requested that the Exchanges identify which orders were mismarked, which specialists or market makers executed those orders and the amount of PFOF Fees that were improperly charged to the Market Makers.

65. The Exchanges have refused to provide an accounting and have taken the position that they cannot be held liable or responsible if they overcharge fees and that they are entitled to (a) refuse to provide any information regarding the nature and amount of those overcharged fees and (b) conceal the extent to which they have violated their own fee schedules.

66. On information and belief, the PFOF Fees were collected in "pooled" accounts of a complex nature.

67. Because of the complexity of the accounts and because the records concerning these accounts are in the Exchanges' possession, the Market Makers have no means of determining the amount of the fees that it was wrongly charged.

68. The Market Makers have no adequate remedy at law that would provide for the relief requested.

WHEREFORE, the Market Makers hereby respectfully request the following relief:

a. That this Court order the Exchanges to provide a full accounting of all PFOF Fees improperly charged to the Market Makers;

b.   That this Court order the Exchanges to identify, or account for, which orders were mismarked, which Market Maker executed those orders and the amount of PFOF Fees that were improperly charged to each Market Maker;

c.   That this Court award each Market Makers such amounts that are determined to be owed to it as a result of this accounting; and

d.   That this Court afford such other relief as is reasonable and just.

## COUNT III (PROMISSORY ESTOPPEL)

69.   The Market Makers incorporate paragraphs 1 through __ as if fully restated herein.

70.   The Exchanges' SEC-approved fee schedules, of which the Exchanges gave public notice to their members, constituted an unambiguous promise that only orders submitted on behalf of customers (and in limited circumstances, certain proprietary and broker-dealer orders) would be assessed PFOF Fees in accordance with the fee schedules.

71.   Each Market Maker relied on the Exchanges' promise by participating in the PFOF Programs and by directing payments and/or allowing payments be made to order flow providers.

72.   Each Market Maker's reliance was reasonable and foreseeable by the Exchanges.

73.   Each Market Maker relied on the Exchanges' promises to its detriment in that it paid PFOF Fees for orders that were not subject to such fees.

WHEREFORE, the Market Makers hereby request that this Court enter an order requiring the Exchanges to reimburse each Market Maker all improperly charged PFOF Fees in an amount to be determined at trial which is expected to be in excess of $75,000, and award such other relief as is reasonable and just.

## COUNT IV (RESTITUTION)

74.     The Market Makers incorporate paragraphs 1 through __ as if fully restated herein.

75.     The Market Makers have paid PFOF Fees to the Exchanges on orders not appropriately subject to PFOF fees.

76.     The Exchanges have failed and refused to reimburse or refund improperly charged PFOF Fees to the Market Makers.

77.     The Exchanges have unjustly benefited as a result of the improperly charged PFOF Fees.

WHEREFORE, the Market Makers respectfully request that this Court enter an order requiring the Exchanges to refund to the Market Makers all improperly charged PFOF Fees in an amount to be determined at trial which is expected to be in excess of $75,000, and award such other relief as is reasonable and just.

## COUNT V (RESCISSION)

78.     The Market Makers incorporate paragraphs 1 through __ as if fully restated herein.

79.     On information and belief, the Exchanges mistakenly believed that the incorrectly marked orders submitted by the Subject Firm were subject to PFOF Fees.

80.     Due to their mistaken belief, the Exchanges misrepresented to the Market Makers that certain orders submitted by the Subject Firm were subject to PFOF Fees.

81.     The Market Makers paid PFOF Fees based on the mistaken belief that the orders being charged PFOF Fees were customer orders or otherwise eligible to be charged PFOF Fees.

23

82.     The Market Makers' mistaken belief as to the eligibility of the improperly charged orders was a material mistake and it occurred notwithstanding the exercise of due care by the Market Makers.

83.     Requiring the Market Makers to pay PFOF Fees on orders that were not subject to PFOF Fees is unconscionable.

84.     Rescission of the PFOF transactions and reimbursement of the PFOF Fees will return the Market Makers to the status quo.

WHEREFORE, the Market Makers respectfully requests that this Court enter an order requiring the Exchanges to rescind and refund to the Market Makers all improperly charged PFOF Fees in an amount to be determined at trial which is expected to be in excess of $75,000, and award such other relief as is reasonable and just.

Date:  May 22, 2013

                                        Respectfully submitted,

                                        Citadel Securities LLC, Group One Trading
                                        LP, Ronin Capital, LLC, Susquehanna
                                        Securities and Susquehanna Investment
                                        Group

                                        By: _____
                                            One of Their Attorneys

Stephen P. Bedell
Ellen M. Wheeler
Lori L Taylor
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone:  312.832.4500
Fax:  312.832.4700